[Civ. No. 9515.   Third Dist.   Mar. 10, 1959.]

JACKSON & PERKINS COMPANY OF CALIFORNIA (a Corporation), Appellant, v. STANISLAUS COUNTY BOARD OF SUPERVISORS et al., Respondents.

Ralph M. Brown and Brown, Brown & Bacon for Appellant.

Frederick W. Reyland, Jr., County Counsel, David G. Dunford, Assistant County Counsel, Clayton M. Ham, Deputy County Counsel, J. F. Coakley, District Attorney (Alameda), and R. Robert Hunter, Chief Assistant District Attorney, for Respondents.

VAN DYKE, P. J.—Appellant corporation appeals from a judgment adverse to it rendered in an action brought by it against respondents to recover ad valorem taxes paid under protest.

Appellant is a Delaware corporation, which does business in California and elsewhere.  It is in the nursery business and has approximately 10,000 acres of land in cultivation in various states.  In its nurseries it principally raises and sells all types of products produced and sold by such a business, including rose plants.  For the latter purpose it operates about 800 acres of land in Stanislaus County.  Its president, Mr. Clarence Perkins, testified as follows: Although it is possible

to plant rose bushes from seed, that method is followed only for a few varieties because generally roses do not come true from seed. It is necessary to adopt the method of budding on wild stocks and this method has been common for at least 50 years. The nurseryman intending to raise roses first prepares the ground after testing the soil for fertility content. The ground must be leveled for irrigation, must be subsoiled and preirrigated. It is then furrowed and planted to cuttings taken from wild stock. The cutting is first deeyed by removing the bottom eyes to keep the cutting from throwing out wild shoots. The cuttings are about 8 inches in length, are planted in rows 4 feet apart and are placed 5 to 8 inches apart in the row. This work is completed in the fall. During the winter the land is kept weeded. In the spring and through the summer the cuttings are budded to the specific types of roses desired. It takes from one to two years to complete the plants to the point where they are salable. Plants intended for greenhouse culture to produce cut flowers are matured in about a year. Those intended for open air planting are ready in two years. If the plants stay in the ground longer they become commercially valueless. The plants require constant care up to harvest. When land has been used to produce rose plants and the plants have been taken off another crop is put in the land to fertilize the soil before it is again used for roses. During culture the plants are subject to many hazards, such as spring winds that dry cuttings, frost, excessive rain, drought, adverse soil conditions, nematodes, vernacular, wilt, Crown gall and the like. Appellant's experience in one year showed that out of two and one-half million plants about one-half million were lost during the growing season. Nurserymen plant, cultivate and propagate plants for sale rather than seeking profit from the product of the plants. Harvesting is done with a machine called a digger that is hooked on the back of a tractor. It has a large U-shaped blade that goes into the ground about 2½ feet. It has a lifter on the blade which lifts the plants and soil up as the machine runs and from there they are pulled out of the soil by hand. The plants are then bundled and sold. They are dormant when harvested.

 Article XIII, section 1, of the California Constitution provides that all property in the state not exempt under the laws of the United States shall be taxed in proportion to its value except that ''growing crops'' shall not be taxed.

The Constitution makes no effort to give specific definition

to the phrase "growing crops." The 1849 Constitution contained no provisions for exemption of any private property from taxation. It provided simply that taxation should be equal and uniform throughout the state and that all property in the state should be taxed in proportion to its value. During the period from 1849 to 1879 the Legislature enacted various exemption statutes, including a statute enacted in 1854 exempting mining claims and growing crops from taxation. The statute was held unconstitutional and void insofar as it exempted growing crops in the case of *People* v. *Gerkee*, 35 Cal. 677. Said the court:

"In the case of *The People* v. *McCreery*, 34 Cal. 433, we held the Revenue Laws of this State to be unconstitutional, so far as they exempt private property from taxation. It follows that, in reading those laws, all parts thereof relating to the exemption of private property must be disregarded.

"The property in question in this case was private property, and was therefore taxable."

In 1884, the Supreme Court decided the case of *Cottle* v. *Spitzer*, 65 Cal. 456 [4 P. 435, 52 Am.Rep. 305], holding that growing fruit trees were not within the meaning of the phrase "growing crops" as used in the Constitution. Said the Supreme Court, adopting an opinion rendered at trial of the cause by Judge Belden, at page 461:

" '. . . What, then, was understood by the convention which framed our present Constitution, and by the people who ratified it, by the term "growing crops?"

" 'By lexicographers crop is defined as, "that which is gathered from a single field or of a single kind of grain or fruit, for a single season; especially the valuable product of wheat if planted in the earth—fruit harvest." [Webster.] "That which is gathered as fruit, the harvest." [Worcester.] In popular parlance the word has the same universal meaning, and the phrases "cropping contracts," "interest in crops," "harvesting crop," and the like, are used in the precise sense in which they are defined in dictionaries. This phrase has also received a practical and general construction in the action of public officials. In 1851, the Legislature attempted, with other classes of property, to exempt "growing crops" from taxation, and from that time until the decision in *People* v. *McCreery*, in 1867, this exemption was conceded by the assessors. During all this period it is a matter of universal knowledge that this exemption was only asserted,

and allowed for annual and immature crops, and it was never pretended that trees or vines of perennial growth came within it. . . .

" '     .     .     .     .     .     .     .     .     .     .     .     .     .

" ' . . . The members of this convention [Constitutional Convention of 1879] could but have been aware of the growing importance of the vine and fruit interest of the State. It was reported to them that fifty millions of capital was then employed in grape culture alone, and yet in all the debates upon this question, both upon the part of those who favored, and by those who opposed this exemption, constant reference is made to a crop to be sown and harvested within the same year, and not even a suggestion that trees or vines of perennial growth were referred to.' "

In 1894 the Constitution was amended to include as exempt from taxation fruit and nut-bearing trees under the age of 4 years when planted in orchard form, and grape vines under the age of 3 years when planted in vineyard form. The limitations requiring planting in orchard form or in vineyard form indicates that it was not intended to include nursery trees when growing as such. *Cottle* v. *Spitzer* appears to be the only taxation case which has directly passed upon the meaning of the phrase "growing crops" as used in the Constitution. But several decisions have considered the phrase in other connotations. In *Hagenburger* v. *City of Los Angeles* (1942), 51 Cal.App.2d 161 [124 P.2d 345], it was held in a zoning ordinance case where the ordinance zoned certain property for "farming," that the growing of nursery stock came within the meaning of the word "farming" as used in the ordinance. *Story* v. *Christin,* 14 Cal.2d 592 [95 P.2d 925, 125 A.L.R. 1402], though not a taxation case, dealt with the question of whether or not nursery stock (in that case trees growing in a nursery) constituted a "growing crop." The action was one for conversion of nursery stock, the alleged conversion having occurred when the defendant as conditional vendor cancelled the conditional sale contract under which plaintiff occupied and used defendant's land to grow nursery stock. Upon cancellation of the contract for breach of its terms, the conditional vendor reentered the property and prevented the plaintiff, the conditional purchaser, from removing his nursery stock. Defendant contended the nursery stock, which consisted of trees planted closely together in rows for development pending sale and transplanting to orchards,

constituted "a growing crop unsevered from the land" at the time the conditional purchaser's right to possession was terminated and as such was a part of the soil and belonged to the conditional vendor. The trial court dismissed plaintiff's action for conversion upon the ground that the complaint did not state a cause of action. The Supreme Court reversed, holding that the nursery trees had the characteristics of stock in trade or a stock of merchandise. Said the court, at page 595:

"Many years ago, it was held that in this state the word 'nursery' as used in respect to horticulture, 'is a place where young trees are propagated for the purpose of being transplanted . . .' (*Attorney-General* v. *State Board Judges*, 38 Cal. 291, 296.) It is a matter of common knowledge that in the nursery business the young trees often remain in the soil for much longer than one year. There is no annual sowing and reaping, the purpose of planting being that they may later be transplanted. Such trees are attached to the soil by roots because only in this manner may they be kept ready for sale. Of course, they grow and develop in the meantime, but they are not a profit of the land in the same sense as an annual crop matured from seed planted in the ground and harvested within the year and do not constitute a 'crop' within the legal meaning of that term."

The factual situation disclosed in *Story* v. *Christin* is very similar to that disclosed by the record here. Other cases recognizing that nursery stock has the characteristics of personal property are *Asato* v. *Emirzian*, 177 Cal. 493 [171 P. 90], and *Kirkman Nurseries* v. *Sargent*, 42 Cal.App. 290 [183 P. 591]. In *Miethke* v. *Pierce County* (1933), 173 Wash. 381 [23 P.2d 405], where a nursery company brought suit to recover taxes paid on nursery stock, claiming that the nursery stock was a "growing crop," the court held that nursery stock did not come within a statutory exemption excluding "crops." The Washington court was concerned with trees being produced in a nursery for transplanting which would mature for that purpose in differing periods of time extending from 2 years to 13 years. The court discussed the meaning of the word "crop" much as did our Supreme Court in *Cottle* v. *Spitzer, supra,* as including only those crops which require an annual planting or sowing or an annual harvesting. After stating the well-settled rule that statutes exempting persons or property from taxation are to be strictly construed

and that exemptions are not to be extended by judicial construction to property other than that designated by the law, the court said:

". . . There is no reason why the stock of nurserymen, growing or otherwise, should not be listed and assessed as merchandise the same as the stock of merchants which are assessed annually, as well as the lands on which situated. The Legislature had the undoubted right and power to define nursery stock as merchandise and to exempt growing crops on cultivated lands."

The court in the Miethke case rejected the argument that to exempt growing crops and to tax nursery stock resulted in discrimination and lack of uniformity, saying:

". . . All annual growing crops on real estate are exempted by the law before us, and all nursery stocks are taxed. Uniformity and equality exist in those classes, and what was to be taxed and what to be exempted was purely a matter of legislative policy."

It appears also that according to administrative interpretation nursery stocks have been consistently taxed as personal property and as not being within the exemption of "growing crops." The county assessor of Stanislaus County testified that so long as he had been in office, a period ranging back to 1948, he had, in accordance with the directions in the "Assessor's Handbook" so taxed nursery stock.

We conclude that the rose plants were, for taxation purposes, not growing crops, but were to be taxed as falling without the exemption.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.